## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANITA J. REIFF,                           )
                                          )
                    Plaintiff,            )
                                          )    **CIVIL ACTION**
v.                                        )
                                          )    **No. 12-1092-JWL**
CAROLYN W. COLVIN,[1]                     )
Acting Commissioner of Social Security,   )
                                          )
                    Defendant.            )
_____ )


## MEMORANDUM AND ORDER


Plaintiff seeks review of a decision of the Commissioner of Social Security

(hereinafter Commissioner) denying Social Security disability benefits (SSD) and

Supplemental Security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A)

of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A)

(hereinafter the Act).  Finding error in the ALJ's evaluation of the medical opinions, the

court ORDERS that the decision shall be REVERSED, and that judgment shall be entered

pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING this case for further

proceedings consistent with this opinion.

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of
Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms.
Colvin is substituted for Commissioner Michael J. Astrue as the defendant, and in
accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

## I.    Background

The Commissioner's decision below discussed two sets of concurrent SSD and SSI applications filed by Plaintiff. (R. 17). The Administrative Law Judge (ALJ) noted that Plaintiff first applied for SSD and SSI on July 1, 2005, alleging disability beginning August 22, 2004. (R. 17). He noted that these applications were denied initially on October 12, 2005 and were not subsequently appealed. Id. In the decision on the current applications, the ALJ found no reason to reopen the earlier determinations, and applied the doctrine of administrative res judicata to determine that Plaintiff was not disabled during the period on and before October 12, 2005. (R. 17-18). Plaintiff does not allege error in that determination, and the court in this opinion will consider disability only for the period beginning October 13, 2005.

At issue here are Plaintiff's concurrent applications for SSD and SSI, protectively filed on November 5, 2007 and alleging disability beginning January 1, 1974. (R. 150, 153-63). At the ALJ hearing, counsel amended the alleged onset date to August 22, 2004, the date Plaintiff stopped working at the level of substantial gainful activity. (R. 17, 43). Moreover, because of the res judicata effect of the denial of the earlier applications, the ALJ, and now the court, will not consider disability for any time before October 13, 2005. Plaintiff's applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ. (R. 17, 81-84, 104-05). Plaintiff's request was granted, and Plaintiff appeared with counsel for a hearing before ALJ Jack D. McCarthy

on May 10, 2010.  (R. 17, 36-37).  At the hearing, testimony was taken from Plaintiff, from a medical expert (ME), and from a vocational expert (VE).  (R. 17, 36-80).

ALJ McCarthy issued a decision on October 29, 2010, finding that Plaintiff is able to perform her past relevant work as a fast food worker and that she is able to perform a range of other sedentary, light, and medium, unskilled work existing in significant numbers in the regional and national economies.  (R. 17-28).  Therefore, he determined that Plaintiff is not disabled within the meaning of the Act, and denied her applications.  (R. 28-29).  Plaintiff sought Appeals Council review of the decision and submitted a Representative Brief for the Council's consideration.  (R. 10-13).  The Appeals Council made the Representative Brief a part of the administrative record in this case and considered it in deciding whether to review the decision.  (R. 1-5).  Nevertheless, it determined that the Brief did not provided a basis for changing the ALJ's decision, found no reason under the rules of the Social Security Administration to review the decision, and denied Plaintiff's request for review.  (R. 1-5).  Therefore, the ALJ's decision is the final decision of the Commissioner.  (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006).  Plaintiff now seeks judicial review of that decision. (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi, 422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d 1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C.

§ 405(g)).  Section 405(g) of the Act provides for review of a final decision of the

Commissioner made after a hearing in which the Plaintiff was a party.  It also provides

that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by

substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine

whether the factual findings are supported by substantial evidence in the record and

whether the ALJ applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084

(10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).

Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such

evidence as a reasonable mind might accept to support a conclusion.  Wall, 561 F.3d at

1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may "neither

reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v.

Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health &

Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005).  Whether substantial evidence supports the

Commissioner's decision is not simply a quantitative exercise, for evidence is not

substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.

Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

     An individual is under a disability only if that individual can establish that she has

a physical or mental impairment which prevents her from engaging in any substantial

gainful activity, and which is expected to result in death or to last for a continuous period

of at least twelve months.  Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting

identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)). The claimant's impairments must be of such severity that she is not only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520, 416.920 (2010);[2] Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e),

---

[2]Because the Commissioner's decision in this case was issued on October 29, 2010, all citations to the Code of Federal Regulations in this opinion refer to the 2010 edition of 20 C.F.R. Parts 400 to 499, revised as of April 1, 2010, unless otherwise indicated.

416.920(e).  This assessment is used at both step four and step five of the sequential

evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--

determining whether claimant can perform past relevant work; and whether, considering

vocational factors of age, education, and work experience, claimant is able to perform

other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).

In steps one through four the burden is on claimant to prove a disability that prevents

performance of past relevant work.  Blea, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show there are jobs in the economy

within Plaintiff's RFC.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred in evaluating the medical opinion of the ME, Dr.

England, failed to provide an adequate narrative discussion when assessing Plaintiff's

RFC, and erred in evaluating the credibility of Plaintiff's allegations of symptoms.  The

Commissioner responds that substantial evidence supports the ALJ's credibility

determination, that the ALJ properly evaluated the opinion evidence, and that the RFC

was properly assessed, supported, and explained.  The court finds that several of the

ALJ's findings with regard to Dr. England's opinion are not supported by substantial

record evidence.  Therefore, remand is necessary for the Commissioner to evaluate the

evidence properly and weigh the medical opinions in light of a correct understanding of

the record evidence.  Because a proper evaluation of Dr. England's opinion will

necessarily involve another narrative discussion, and because the ALJ's credibility determination may change when Dr. England's opinion is properly evaluated, the court will not address those issues in this opinion. Plaintiff may make her arguments in that regard to the Commissioner on remand.

## III.    Evaluation of Dr. England's Opinion

Plaintiff claims that the ALJ did not accord sufficient weight to Dr. England's opinion that Plaintiff could perhaps work at a low stress, simple job for one to three months, but that she would then decompensate and be unable to continue with the work. (Pl. Br. 12) (citing R. 61). She also claims that, contrary to the ALJ's finding, both Dr. DeSilva's and nurse-practitioner Long's[3] opinions are objective evidence supporting the ME's opinion. Id. at 13. The Commissioner argues that the ALJ properly evaluated Dr. England's opinion, and gave good reasons for discounting it. (Comm'r Br. 17-20).

### A.    The ALJ's Evaluation of Dr. England's Opinion

Dr. England is a psychologist who testified as a medical expert at the ALJ hearing. (R. 17, 20-22, 55-64). The ALJ summarized Dr. England's testimony, and specifically noted Dr. England's opinions after reviewing the medical record: that Plaintiff had mild

---

[3]The ALJ called the nurse-practitioner who treated Plaintiff, "Arlene Long" (R. 20) (citing Ex. 33F (R. 698-715)), and the nurse-practitioner who submitted a Medical Source Statement (Mental) regarding Plaintiff, he called, "Arlene Loy." (R. 23-24) (citing Ex. 32F (R. 694-97)). The record reveals that they are one and the same person, because their signature is identical. (R. 630, 696, 697, 702, 705, 708, 711). Although the signature certainly appears to read "Arlene Loy," the treatment records contain the signature over printed signature blocks which reveals that her name is "Arlene Long." (R. 630, 702, 705, 708, 711).

to moderate limitations in activities of daily living; that Plaintiff had " 'moderate to marked' limitations, 'at times,' in the areas of social functioning and maintaining concentration, persistence or pace;" and that Plaintiff had no previous episodes of decompensation.  (R. 21).  He summarized Dr. England's opinion "that if the work involved much stress, this work would preclude the claimant from any ongoing work activity, albeit she could meet low-stress, repetitive work over a 1 to 3 month period."  Id.

The ALJ stated that he had compared and contrasted Dr. England's opinion to the record medical evidence.  Id.  He found that Plaintiff's mental impairments would not preclude sustained, full-time work "as long as she remains substance free and medication compliant," and cited to treatment records from Valeo Behavioral HealthCare (hereinafter Valeo) as showing "no significant mental health findings for the claimant," and to the "Initial Treatment Plan" page from an "Intake Assessment" completed by a social worker, Ludy Sapp, on January 8, 2007, in which she assessed a GAF score of 60.[4]  Id. (citing Ex. 7F, and7F/17 (R. 426)).  He then explained why he discounted Dr. England's opinion:

---

[4]A Global Assessment of Functioning, or GAF, score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. text revision 2000).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 34.  GAF is a classification system providing objective evidence of a degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).
GAF scores in the range of 51-60 indicate "**Moderate symptoms** . . . **OR moderate difficulty in social, occupational, or school functioning.**"  DSM-IV-TR, at 34 (emphasis in original).

Dr. England stated that it had appeared that the claimant's mental condition had <u>deteriorated</u> over time. The undersigned notes that the medical expert did not cite any specific medical records as the basis for his opinion. However, it is noted that the medical records do indicate a <u>significant improvement</u> in the claimant's mental condition once she ceased abusing drugs and became more compliant with her medication regimen.

(R. 21) (emphases added).

The ALJ noted the state agency psychological consultants' opinions that Plaintiff had been in remission from substance abuse since March 2007, "and this [(along with medication)] had resulted in a positive impact . . . on the claimant's functioning." <u>Id.</u> He cites one page each from the medical treatment notes from Valeo and from the Kanza Mental Health & Guidance Center (hereinafter Kanza) in support of this assertion. <u>Id.</u> (citing 6F/10) (R. 407) (dated 12/18/2007) ("substance free since March 2007," no mention of medication); 7F/35 (R. 444) (dated 15 June 07) ("Has been clean about 90 days." "Feels better," patient agrees with treatment plan and verbalizes understanding of medication information and directions, no mention of medication compliance)). The ALJ continued along the same line:

The undersigned notes that the 2007, 2008 and 2009 mental status examination findings from Valeo Behavioral HealthCare and Kanza Mental Health & Guidance Center, when the claimant was substance free and medication compliant, are essentially unremarkable. Those exams show that the claimant's appearance was unremarkable and she was oriented, with clear speech and organized thoughts. Her perception was also reported to be normal and her thoughts goal directed (Exhibits 7F/21, 33 and 35 [(R. 430, 442, 444)] and 30F/3, 5, 7 and 9 [(R. 619, 621, 623, 625)]). However, various mental health sources of record, in November and December of 2007 and April 2009, assessed low GAF ratings of 43 and 45 for the claimant, which are indicative of serious mental symptoms, according to the Global Assessment of Functioning ("GAF") Scale (Exhibits 5F/6 [(R.

392)], 6F/4 and 11 [(R. 402, 409)], and 30F/11 [(R. 627)]). The undersigned notes herein that the diagnostic criteria from DSM-IV places GAF scores of 43 and 45 within the range of 41-50.[5] Individuals who fall within this range exhibit serious mental symptoms (i.e., suicidal ideation, severe obsessive rituals, frequent shoplifting, etc.) or any impairment in social occupational or school functioning (i.e., no friends, unable to keep job, etc.). As previously stated, the mental status examination findings for the claimant during that period of time were essentially unremarkable. Accordingly and based on the review of the contemporaneous medical notes related to the assignment of the aforementioned GAF scores, the undersigned finds that the medical evidence does not support the assignment of these scores and, therefore, they are being given little weight. The undersigned notes the State agency program psychologists considered many of these records with these GAF ratings and did not find them controlling as they found the claimant was not disabled from all work (Exhibits 12F [(R. 469-72)], 13F [(R. 473-86)], 17F [(R. 496)] and 22F [(R. 519)]). The undersigned generally agrees with the State agency program psychologists.

(R. 22).

The ALJ then noted that the state agency psychologist's opinion as expressed in Exhibits 12F and 13F (R. 469-86) was subsequently affirmed as written by two additional state agency psychologists in Exhibits 17F and 22F (R. 496, 519). (R. 22). The ALJ concluded his analysis of Dr. England's medical opinion:

The undersigned finds that Dr. England's testimony at the hearing with respect to the claimant's inability to perform gainful employment due to her mental condition was not consistent with the medical evidence, as previously discussed. Where the opinions of Dr. England differ from those of the State agency program psychologists, the undersigned finds the opinions of the State agency program psychologists are more consistent

---

[5]GAF scores in the range of 41-50 indicate "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV-TR, at 34 (emphasis in original).

with the overall weight of the evidence and the undersigned, therefore,
gives them greater weight.

(R. 23).

### B.   Record Evidence

When Dr. England began his testimony, he asked for Plaintiff's alleged onset date

of disability.  (R. 56).  The ALJ responded that the onset date had been amended to

August 22, 2004, whereupon Dr. England explained that his testimony would "be

somewhat limited then by the fact that the mental health record doesn't extend back that

far."  (R. 56).  Moreover, Dr. England's testimony reflects a firm grasp of the essence of

the mental health records, including the consultative examination report prepared by Dr.

Wilkinson and the opinions of the state agency psychological consultants.  (R. 55-64).

As Dr. England's testimony suggests, the first record of mental health treatment

was about two and one-half years after Plaintiff's alleged onset date, when Ms. Sapp, an

LSCSW social worker did an "Intake Assessment" of Plaintiff's condition for Valeo on

January 8, 2007.  (R. 421-27).  Ms. Sapp's report indicated Plaintiff used marijuana from

age 15 to the present (Jan. 2007), and used methamphetamine from age 22 until 2 months

ago (Nov. 2006).  (R. 422).  She noted that Plaintiff had been taking Zoloft for the last

year because of depression and anxiety.  (R. 423).  Ms. Sapp reported Plaintiff's mental

status exam on a check-box form in which she indicated that Plaintiff had a depressed,

tearful, guilty, anxious, and irritable mood; impaired remote and recent memory; fair

insight; her cognition and attention revealed distractibility and poor concentration,

impaired abstract thinking, and impaired judgment; her behavior and motor activity revealed aggression/rage, impulsiveness, avoidance behavior, decrease in energy, fatigue, loss of interest in activities, that she was restless/overactive, and that she was tense; she had insomnia and nightmares; her anxiety symptoms included hyper-vigilance and reliving traumatic events; she was short-tempered; she had impairment in occupational functioning; her interpersonal/social characteristics revealed that she chooses relationships that lead to disappointment, she expects to be exploited or banned by others, and she has unstable and intense relationships; and her thought content/perceptions reveal "other hallucinatory activity" wherein she "hears [her] name called and sees shadows out of the corner of her eye." (R. 424). Ms. Sapp assessed a GAF score of 60. (R. 426).

The record reflects that Plaintiff was then treated at Valeo from May, 2007 through December 2007. (R. 427-46, 493). In this period, there are a number of telephonic contacts with Plaintiff, but there are only three office visits recorded. As the ALJ noted, the objective findings at each such visit were generally unremarkable. Id. However, the handwritten treatment notes, to the extent that they can be deciphered, are more revealing. In June 2007, Plaintiff reported she had been clean 90 days. (R. 444). In August 2007, it was reported that in the last month and a half Plaintiff had had at least three episodes of heart pounding where it feels like she is in a tunnel, suggesting panic attacks. (R. 442). The handwritten notes from November 2007 reveal increasing mood swings, increasing bouts of tearfulness, decreased sleep, racing thoughts, and increased irritability. (R. 430).

Plaintiff was evaluated for admission to treatment with Kanza on November 5, 2007, and began mental health treatment there on November 12, 2007. (R. 391, 395). As with Ms. Sapp's mental status exam at Valeo, Plaintiff's "Adult Admission Evaluation Report" at Kanza indicates Plaintiff's condition implicates 30 of 39 possible presenting problems, including such problems as trouble sleeping, nightmares, depression, mood swings, worry, adjustment problems, history of physical abuse, racing thoughts, hearing voices, paranoid thoughts, drug abuse, aggression, and suicidal thoughts. (R. 395). It also indicates that she had been for sober seven months. Id.

On November 12, 2007, Mr. Richey, an alcohol and drug counselor, provided an Alcohol and Drug Evaluation in which he assessed Plaintiff with a current GAF of 43 and a past GAF of 18,[6] and assessed her prognosis as "Guarded." (R. 394). He noted that Plaintiff was referred by her probation officer after in-patient treatment at the Women's Recovery Center. (R. 393). He noted a history of a suicide attempt, and significant substance abuse history since age seventeen including, marijuana, methamphetamine, IV methamphetamine, Valium, LSD, Psilocybin, LSD, Methadone, and alcohol. Id. He noted that her last use was in March 2007, and that she had received in-patient alcohol and drug treatment for 35 days in June and July 2007. Id. He administered psychological

_____

[6]A GAF score in the range from 11 to 20 indicates "**Some danger of hurting self or others** (e.g., suicide attempts without clear expectation of death, frequently violent, manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g., smears feces) **OR gross impairment in communication** (e.g., largely incoherent or mute)." DSM-IV-TR at 34 (emphasis in original).

testing which indicated Plaintiff was non-dependent on alcohol, but had a "High Probability of having a Substance Dependence Disorder." (R. 394). He recommended counseling and weekly attendance at Narcotics Anonymous, and Plaintiff agreed. Id.

Plaintiff began individual psychotherapy with medical evaluation and management by psychiatrist, Dr. DeSilva at Kanza on December 18, 2007. (R. 407-09). In his mental status examination, Dr. DeSilva noted Plaintiff was "somewhat anxious," her attention and concentration were "somewhat impaired" but she could maintain a conversation, she has concrete thinking, she has "perceptual disturbances in the form of hallucinations," her judgment is "significantly impaired when she is under the influence of drugs," she is of low average intelligence, and has "some insight as to her problems." (R. 408). He assessed Plaintiff with a GAF of 45 and opined that her prognosis was "Guarded." (R. 409).

Psychologist, Sallye Wilkinson administered a consultative examination of Plaintiff for the state disability determination service on January 8, 2008, and provided a report of that examination. (R. 463-66). The history and background presented in Dr. Wilkinson's report is consistent with the earlier records. She did note Plaintiff's report that she has a bad temper which is not as bad as when she was on drugs, and that Plaintiff had gotten in a physical fight with her daughter's drug-abusing father a few weeks earlier, but didn't remember "the details of the fight as if she had a dissociative episode." (R. 463-64). Dr. Wilkinson devoted considerable space to Plaintiff's mood, noted her reported anxiety and depression, and reported that Plaintiff's "clinically observed mood

was slightly dysphoric." (R. 464). She specifically noted "a chicken-and-egg quality to [Plaintiff's] mood disturbance. Said differently, did her mood disturbance underlie her addictions? Or vice-versa?" (R. 464). She noted Plaintiff's impulsivity; and found fair attention, concentration, and memory; concrete thinking; and poor judgment and insight. (R. 464-65). She assessed Plaintiff with a current GAF of 40[7] and highest GAF in the last year of 50. (R. 465). She diagnosed Plaintiff with Depression NOS, rule out Major Depressive Disorder; Anxiety NOS, rule out Posttraumatic Stress Disorder; Polysubstance Dependence Early Partial Remission; Intermittent Explosive Disorder; and Antisocial Personality Disorder. Id.

On January 15, 2008, after reviewing the record up to that point (including Dr. Wilkinson's report), state agency psychologist, Dr. Jessop, opined that as long as Plaintiff remains abstinent from drugs and has only limited contact with coworkers, supervisors, and the general public, she is able to perform simple to intermediate work activities. (R. 471). Dr. Jessop discussed Dr. Wilkinson's report only as "a current MSE [mental status examination], which discusses an antisocial personality disorder, depression, and anxiety," and noted that the medical records to date and Plaintiff's reports of activities of daily living "suggests that she has been in remission regarding substance abuse since

---

[7]A GAF score in the range from 31 to 40 indicates "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34 (emphasis in original).

March, 2007, and that this has had a positive impact along with medication on her functioning." (R. 485).

In February, 2008, Dr. DeSilva reported in his "Objective findings" that Plaintiff was nervous, anxious, and impulsive, and had "fair" medication compliance. He noted Plaintiff's report that she was rebuilding a house with her son, that she felt relatively stable on medications, and was searching for jobs. (R. 515). He noted her progress toward goals was "fair," id., and assessed her prognosis as "Guarded." (R. 516). In March, he reported all "Objective findings" as normal, and noted that Plaintiff was feeling more stable on medication, continued to be able to function, and was proud to now be working at Taco Bell. (R. 513). He noted her progress toward goals was "fair," id., upgraded her prognosis to "fair," and scheduled the next appointment for two months. (R. 514).

On May 21, 2008, state agency psychologist, Dr. Schulman performed a case analysis at the reconsideration level. (R. 495-96). He noted that Plaintiff was vocationally active with a positive employer report, and affirmed Dr. Jessop's opinion from January 15, 2008. (R. 496). There is a Work Activities Questionnaire in the record dated April 17, 2008 which was completed by Plaintiff's supervisor at Taco Bell. (R. 302-05). Apparently this is the "positive employer report" to which Dr. Schulman referred. In that report, it was noted that Plaintiff "mostly" stays on the assigned job with ordinary supervision, but that she needs assistance a few times; that although Plaintiff was

given no special consideration, she preferred short shifts; and that Plaintiff worked only part-time and had never worked a full-time schedule at Taco Bell.  (R. 303-04).

Plaintiff again visited Dr. DeSilva on August 19, 2008, and the psychiatrist reported normal "Objective findings" once again.  (R. 511).  However, his summary of Plaintiff's "Current Psychosocial Situation" is more revealing:

> The patient reported that she has not been working for a couple of months, as she walked out of the restaurant where she was working as a waitress, as it was getting stressful.  The patient also described the stress as being somewhat panicky and anxious.  The patient also reported that she has stopped see[ing] Melissa McDaniel for therapy, thinking, "I was cured." However, the patient wants to get back to seeing Melissa for therapy again.

(R. 511).  Dr. DeSilva found Plaintiff's progress toward goals was "fair," id., and once again assessed her prognosis as "Guarded."  (R. 512).  On October 21, 2008, Dr. DeSilva recorded "Objective findings" of anxious and impulsive mood, pressured speech, restless motor activity, and "fair" medication compliance.  (R. 509).  The psychiatrist recorded numerous stressors in Plaintiff's life over "the past few weeks," and noted that Plaintiff had begun taking some Klonopin a friend gave for anxiety.  Id.  He noted her progress toward goals was "fair," id., made a medication change to include a prescription for Klonopin, and assessed Plaintiff's prognosis as "Guarded."  (R. 510).  A month later, the psychiatrist recorded normal "Objective findings" and "fair" medication compliance, noted that the Klonopin had helped Plaintiff's coping, noted her progress toward goals was "fair," and upgraded her prognosis to "Fair."  (R. 507-08).

In January, 2009 the psychiatrist noted normal "Objective findings" and "good" medication compliance, and noted Plaintiff's report of stable and less fragmented or anxious moods. (R. 505). He noted Plaintiff's progress toward goals was "fair," and reported her prognosis as "Fair." (R. 506). In March 2009, he recorded poor hygiene; blunted, flat affect; slurred speech; loose thought; and "Poor" medication compliance. (R. 503). He reported that Plaintiff drove to the appointment appearing quite sedated, and staff assisted in getting her back home and advised her not to take pain relievers and muscle relaxers excessively. Id. His assessment of progress toward goals was "guarded," and his prognosis was "Guarded." (R. 504).

In June of 2009, the case was an Office of Disability Adjudication and Review (ODAR) informal remand case and was referred to a state agency psychologist for a "re-review of the entire folder," (which apparently included all of the evidence discussed above, but the evidence discussed below had not been submitted to the agency yet) and an assessment of Mental RFC. (R. 517). Psychologist, Dr. Adams reviewed the file and affirmed Dr. Jessop's opinion as written. (R. 519). Dr. Adams stated that the "Kanza MHC notes indicate stable functioning." Id.

In April, 2009 Dr. DeSilva noted an anxious, impulsive affect; that Plaintiff takes an extra dose of Klonopin when she gets quite anxious; and that "[s]ome of the struggles seemed to be tied up with the patient's son moving back to live with her and becoming quite provocative and obnoxious. (R. 625). He reassessed Plaintiff's progress toward goals as "fair" and assessed her with a "Guarded" prognosis. (R. 626). In July, 2009 Dr.

DeSilva reported normal "Objective findings," with fair medication compliance, and reported that Plaintiff was sad about her son leaving home despite his causing her great distress while he was living with her. (R. 623). He assessed Plaintiff's progress toward goals as "fair," id., and a prognosis of "Guarded." (R. 624). In September, 2009, Dr. DeSilva recorded his "Objective findings" that Plaintiff appeared nervous; that her cognition was oriented, but distractible; that her affect was anxious and impulsive; and that her medication compliance was "fair." (R. 621). He reported that Plaintiff was under a great deal of stress and feels overwhelmed and has problems tending to day-to-day issues at home. Id. He assessed her progress toward goals as "fair," id., and her prognosis as "Guarded." (R. 622).

At Plaintiff's visit on September 15, 2009, Dr. DeSilva provided a "Doctor's Statement" regarding Plaintiff's mental health condition. (R. 522-23). In the statement, Dr. DeSilva described Plaintiff's condition as "Mood disorder NOS" and "Post Traumatic Stress disorder," and stated that it was a life-long illness which could be controlled with medication, but that it would prevent gainful employment. (R. 523). He noted that Plaintiff was taking medications which would hinder her performance, that she would have difficulty dealing with the public or group situation, and that he was unable to determine whether there would be types of work that would be more appropriate for Plaintiff than other types of work. Id.

At Plaintiff's visit in November, 2009 Dr. DeSilva recorded normal "Objective findings," except that her affect was anxious, and her medication compliance was fair.

(R. 619).  He reported that Plaintiff was able to manage staying at home and taking care of needs, but that she was having problems sleeping and problems with panic attacks, and that Seroquel was not as effective as previously for a sleep aid, and that the panic attacks make her want to take more Klonopin than prescribed.  (R. 619).  He assessed "fair" progress toward goals, and a "Guarded" prognosis.  (R. 620).  Plaintiff began treatment at Kanza with nurse-practitioner Long on February 1, 2010, and was treated four times through March 22, 2010.  (R. 700-11).  On February 11, after two visits, Ms. Long provided a "Medical Source Statement - Mental" in which she opined that Plaintiff was "Not Significantly Limited" in four of twenty mental abilities, was "Moderately Limited" in ten mental abilities, and "Markedly Limited" in six mental abilities.  (R. 696-97).

### C.      Discussion

As the ALJ found, the treatment records do not support Dr. England's testimony that Plaintiff's "condition may have deteriorated some over time" after January 2008.  (R. 62).  Rather, the treatment records as summarized above reveal that Plaintiff's condition over time was at least a washboard, if not a rollercoaster.  It would gradually improve for a while and would then deteriorate for a while.  This appears to have been a repetitive process throughout the time from January 2007 through at least November 2009.  Nevertheless, contrary to the ALJ's finding, the medical records do not indicate "significant improvement in the claimant's mental condition once she ceased abusing drugs and became more compliant with her medication regimen."  (R. 21).

In fact, there is simply no record of Plaintiff's mental condition before she ceased abusing drugs--treatment notes from that time period are not in the record. And, the ALJ points to no time when Plaintiff became more compliant with her medication regimen. Much of the telephonic notes from the Valeo treatment records concern issues with Plaintiff's compliance with medication. (R. 411-46). As to the Kanza treatment records, they record only one instance of "good" medication compliance (R. 505), and only one instance of "poor" medication compliance. (R. 503). All other Kanza records show "fair" medication compliance. The ALJ's findings in this regard are not supported by substantial record evidence, and that is error requiring remand for a proper evaluation of the record evidence.

To be sure, as discussed above Dr. Jessop noted that the medical records to date (January 2008) and Plaintiff's reports of activities of daily living "suggests that she has been in remission regarding substance abuse since March, 2007, and that this has had a positive impact along with medication on her functioning." (R. 485). The evidence supports Dr. Jessop's finding that Plaintiff's substance abuse has been in remission since March, 2007, but there is no evidence demonstrating that Plaintiff's stopping drug abuse and "fair" compliance with medication has had a positive impact on her functioning. While that is a supposition or expectation which might be inferred from the facts of stopping drug use and "fair" medication compliance, that inference is insufficient to overcome Dr. England's, Dr. Wilkinson's, and Dr. DeSilva's apparently contrary opinions, especially since there is no record evidence to support the inference made. The

fact that Dr. Schulman and Dr. Adams affirmed Dr. Jessop's opinion is of little assistance to overcome the contrary opinions, because no evidence was received in the interim supporting the inference made.

The court also finds error in the ALJ's finding that "the opinions of the State agency program psychologists are more consistent with the overall weight of the evidence [than Dr. England's opinion] and the undersigned, therefore, gives them greater weight." (R. 23). To the extent that Dr. England testified that Plaintiff's condition deteriorated over time after January, 2008, that opinion is inconsistent with the record evidence. However, as discussed above the opinions of the state agency psychologists--that Plaintiff's functioning has improved over time since she stopped abusing drugs--are also inconsistent with the overall weight of the evidence. Remand is necessary for the Commissioner to properly weigh the medical opinions of Dr. England, Dr. Wilkinson, Dr. DeSilva, Dr. Jessop, Dr. Schulman, and Dr. Adams.

The court is mindful that it is without authority to reweigh the record evidence or to substitute its judgment for that of the Commissioner. Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172. Nonetheless, it must determine whether the factual findings of the Commissioner are supported by substantial record evidence. Lax, 489 F.3d at 1084; accord, White, 287 F.3d at 905. It may not affirm findings for which there is no evidentiary support beyond the mere supposition or expectation expressed by a state agency psychologist.

**IT IS THEREFORE ORDERED** that the Commissioner's decision shall be

REVERSED, and that judgment shall be entered pursuant to the fourth sentence of 42

U.S.C. § 405(g) REMANDING this case for further proceedings consistent with this

opinion.

Dated this 21st day of March 2013, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**